IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

**CARRIE ANN SPENCER,**

      **Plaintiff,**

v.                                          **CASE NO. 2:10-cv-01151**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Plaintiff did not file a brief in support of her complaint. Defendant did file a brief in support of Defendant's decision. (ECF No. 10.)

Plaintiff, Carrie Ann Spencer (hereinafter referred to as "Claimant"), filed an application for DIB on August 15, 2006, alleging disability as of December 13, 2002, due to fibromyalgia, possible multiple sclerosis, seizures due to stress and anxiety, memory loss, trouble sleeping due to pain, chronic pain, chronic fatigue, nerves, depression, and problems with concentration.[1] (Tr. at 7, 137-39, 148-50, 182-88, 240-45, 255-60.) The

---

[1] On August 19, 2005, Claimant filed a prior Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income payments, alleging disability beginning December 13, 2002. These claims were denied at the initial determination level on January 6, 2006, and at the reconsideration determination

claim was denied initially and upon reconsideration. (Tr. at 7, 78-82, 83-87, 98-102, 105-07.) On August 15, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 108.) The hearing was held on June 17, 2008 before the Honorable Toby J. Buel, Sr. (Tr. at 39-73, 114.) By decision dated September 2, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 7-32.) The ALJ's decision became the final decision of the Commissioner on July 29, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3.) On September 28, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is

---

level on March 27, 2006. (Tr. at 89-91, 92-94.) The claimant did not appeal the reconsideration determination. (Tr. at 15.) Claimant's earning record shows she acquired sufficient quarters of coverage to remain insured through December 31, 2007. Therefore, Claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits. (Tr. at 8.)

present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 12.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of fibromyalgia, lumbar strain, and arthralgia. (Tr. at 12-22.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 22.) The ALJ then found that Claimant has a residual functional capacity for medium work. (Tr. at 23-30.) As a result, Claimant can return to her past relevant work as a telemarketer, which was classified as sedentary in

exertion. (Tr. at 30-31.) On this basis, benefits were denied. (Tr. at 31.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is supported by substantial evidence.

Claimant's Background

Claimant was 30 years old at the time of the administrative hearing. (Tr. at 137.) She has a high school education, three years of college, and certifications in medical assistance and phlebotomy. (Tr. at 52, 187, 357, 492.) In the past, she worked as a telephone marketer, waitress, convenience store cashier, emergency room and kidney dialysis center certified nursing assistant [CNA]. (Tr. at 49-53, 439.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will discuss it below.

Physical Evidence

Medical records indicate Claimant was treated on 16 occasions by Mason White, M.D., from January 16, 1997 to November 22, 2006 for various eye examinations. (Tr. at 415-22.) Although the handwritten notes are largely illegible, the most recent notation clearly states: "'whole lot better' 20/20."

Medical records indicate Claimant was treated on six occasions by John Byrd, M.D. from May 30, 2002 to July 1, 2003. (Tr. at 279-86.) The initial office visit notes dated May 30, 2002 indicate that Claimant is "in good general health except for a two year history of generalized aching, non-restorative sleep, and fatigue. She was recently diagnosed with severe anxiety and placed on Xanax which has helped 'a lot'...Suspect primary fibromyalgia even in the absence of multiple tender points...Continue Xanax...add Elavil." (Tr. at 282.) On June 17, 2002, office notes indicate Claimant is "[n]ot able to tolerate low dose of Elavil due to shakiness...have asked her to discontinue Xanax." (Tr. at 281.) On August 13, 2002, office notes indicate Claimant was prescribed "Klonopin...2 or 3 nights a week." Id. On November 5, 2002, office notes indicate: "Follow-up fibromyalgia. In today with continued fragmented sleep and fatigue. Increasing difficulty coping as a telemarketer. Blood pressure is 110/70." (Tr. at 280.) On January 7, 2003, notes state: "Follow-up fibromyalgia. In today with severe right leg pain...Still not sleeping very well with panic disorder." Id. On April 8, 2003, office notes state: "Follow-up fibromyalgia. In today after a seizure-like episode at work. Evaluation by neurology felt this was stress-related and did not

recommend anti-seizure medications…I refilled her Klonopin and Trazodone for 3 additional months. Paxil 20 mg. daily. I suggested that she try to get into a support group locally." Id. Notations dated November 1, 2003 state "no show." Id.

On February 6, 2002, Claimant was treated at Charleston Area Medical Center ["CAMC"] Emergency Department by Daniel B. Prudich, M.D., who noted:

Chief Complaint: Right hand pain, status post fracture.

> History of Present Illness: This is a 23-year-old while female who states that she fractured her right fifth metacarpal three months ago. She was seen at Logan General…She states that a cast was placed by Dr. Padman in follow-up. She kept the cast in place for 10 weeks. The cast was removed approximately one month ago. Patient states that she continues to have swelling and pain to the fracture area. The pain worsened today after she accidentally hit the edge of her hand up against something. Otherwise she denies any reinjury to the area. She initially injured her hand from punching a chair…Patient has not been taking any pain medication…She does not wish to return to Dr. Padman. She wishes to have a second orthopedic opinion here from CAMC, General…
>
> Laboratory/X-ray Results: Right hand x-rays were obtained, results showing an old, healed right fifth metacarpal fracture…
>
> X-rays reviewed. Patient shown copies of her x-ray and given copies to take to Dr. Fathy in follow-up. I discussed with patient the healing metacarpal fracture, it is essentially non displaced…I discussed the importance of rest, ice and elevation. She will start on Naprosyn for pain. A metacarpal splint was placed with an Ace wrap to secure.

(Tr. at 327-29.)

Medical records indicate Claimant was treated on five occasions by Ulysses D. Agas, M.D. from March 28, 2002 to December 12, 2003. (Tr. at 287-92.) Although the handwritten notes are largely illegible, notes dated March 28, 2002, May 1, 2002, and September 20, 2002 legibly state "Anxiety…Xanax" and notes dated December 12, 2003 legibly state "has MS & fibromyalgia, needs something for pain." (Tr. at 287, 289-90, 292.)

On June 10, 2002, Claimant was treated at CAMC Emergency Department for complaints of "dizzy - feel like going to pass out, tingling all over...Medications taken at home: Xanax prn; Generic form of Neurotin ? Possibly - new med." (Tr. at 321.)

On June 11, 2002, Claimant was treated at CAMC Emergency Department for complaints of "dizziness - possibly r/t [reaction to] Amitriptyline started 1 week ago." (Tr. at 315.)

Treatment records from Mountain Medical Care Center indicate Claimant was a patient of Katherine Hoover, M.D. from January 14, 2003 to May 24, 2007, during which time she had 53 office visits in which she was prescribed Lortab and Xanax on each occasion. (Tr. at 361-406, 457-89.) Her diagnoses include: "pain in the back/legs, R [right] knee due to L-S [lumbar spine]...PTSD [post traumatic stress disorder]...panic attacks, insomnia, fibromyalgia." Id.

On January 22, 2003, Claimant was treated at CAMC Emergency Department by Leon S. Kwei, M.D.:

> Apparently at approximately 4 p.m. this afternoon she had witnessed generalized tonic-clonic activity by her father lasting several minutes. This was followed with postictal drowsiness. She apparently had bit her tongue but did not have any bowel or bladder incontinence. She apparently has not been sleeping much the night before because she was stressed because her friend's father had recently passed away. She has no history of any seizure disorder in the past. No malaise. No fever or chills. No headache....No joint pain or swelling. No myalgia...No depression or anxiety...No fatigue...Patient is alert, well appearing, in no distress...
>
> The patient was observed here in the Emergency Department. He [sic] had no seizure activity here...feeling well, wanting to go home...Will discharge home. Outpatient sleep deprived EEG...Patient was warned of no further driving until further evaluation by neurologist. Referral to Dr. Kiren Reahl in 1-2 weeks. Patient agrees with above.

(Tr. at 311-12.)

7

On January 22, 2003, a brain/cranial CT without contrast was performed at CAMC by James T. Smith, M.D. Dr. Smith noted "no abnormality. Impression: Normal study." (Tr. at 313.)

On February 5, 2003, Kiren Kresa-Reahl, M.D., a neurologist, reported that Claimant had "[n]ew onset seizures, possibly provoked by lack of sleep or change in medication…I will order an MRI of the brain…to look for any focal source of her seizures. I will order an EEG to look for any focal disturbance for her seizure." (Tr. at 278.)

Records from CAMC indicate Claimant received various treatment and testing, including obstetrical ultrasounds, related to her pregnancy and childbirth between August 28, 2003 and December 2, 2003. (Tr. at 296-309.) Claimant reports that her child was adopted by her parents, with whom they both live. (Tr. at 426.)

On June 21, 2005, Torin P. Walters, M.D., Williamson Memorial Hospital, interpreted an MRI of Claimant's Brain with and without contrast, per the order of physician Katherine Hoover, M.D.:

> The study is normal. There is no abnormal parenchymal signal. There are normal flow voids within the vessels indicating patency. There is no extra-axial fluid collection, intraparenchymal hemorrhage or abnormal enhancement. The ventricles and CFS containing spaces are normal.
>
> IMPRESSION: Normal MRI of the brain with and without contrast.

(Tr. at 330.)

On December 19, 2005, a State agency medical source completed a Physical Residual Functional Capacity ["PRFC"] Assessment and opined that Claimant could perform light work with postural limitations marked as "occasionally" in all areas, save climbing ladder/rope/scaffolds, which was marked "never"; unlimited in manipulative; no visual or

communicative limitations; and unlimited in all environmental areas, save to avoid concentrated exposure to extreme temperatures and to avoid even moderate exposure to hazards. (Tr. at 350-54.) The evaluator, Rosalind Go, M.D., concluded:

> ADLS [Activities of Daily Living] - does laundry, load/unloads dishwasher, shops, spends time with friends, trouble with all physically exertional activities, has to move around because body stiffens up.
>
> PPQ [Personal Pain Questionnaire] - hurts all over, back, and head - takes Lortab, Xanax, and Aleve.
>
> Seizures - 5/03, 3/04, 8/05, however clmt [claimant] told CE [clinical examiner] that she had been seizure free since 8/04...
>
> She alleges fibromyalgia, stress-related seizures, & anxiety. Her ADL are as mentioned above, & they showed some restrictions which are not fully supported by medical evidence of records. Her pains & symptoms are partially credible & they will restrict her to do only light work.

(Tr. at 355.)

On March 16, 2006, Amy Wirts, M.D., reviewed the evidence of record and Dr. Go's reports and provided a "Case Analysis": "Medical Evidence in file has been reviewed and the PRFC of 12/19/05 is affirmed as written." (Tr. at 358.)

On June 19, 2006, Dr. Hoover provided a "To Whom It May Concern" medical statement which stated: "Carrie Spencer is under my care. She was seen today for an office visit. Please excuse patient permanently. Comments: Pt [patient] Is unable to work due to severe fibromyalgia. Thanks." (Tr. at 359.) In response to the form question "What is the patient's diagnosis of illness?" she stated: "Fibromyalgia, anxiety, R [right] knee injury." (Tr. at 360.) In response to the form questions, "Is the diagnosis permanent? If so, please state an approximate date of diagnosis. Does the illness prevent ALL participation in employment at this time (100% disability)?" she stated: "Yes - 2000 per pt. I have seen her

9

since 1-14-03." Id. In response to the question "Is there a possibility of returning to work at a later date?" she responded: "No - unlikely unless new treatment for fibromyalgia." Id.

On November 3, 2006, a State agency medical source attempted to complete a Physical Residual Functional Capacity ["PRFC"] Assessment. (Tr. at 407-14.) The evaluator, Marcel Lambrechts, M.D., concluded: "Further information is unavailable as clmt [claimant] has failed to return ADL [activities of daily living] form and PPQ form. Insufficient evidence to assess current status." (Tr. at 414.)

On November 27, 2006, Roger C. Baisas, M.D. provided a "Social Security Disability Evaluation" report (Tr. at 423-29.) Dr. Baisas concluded after an examination of Claimant and a review of Progress notes from Mountain Medical Care Center dated March 8, 2006 to October 5, 2006:

> **Diagnoses**: (based on history, clinical findings and diagnostic studies)
> ICD 729.1 Fibromyalgia
>
> **Prognosis**: Fair
>
> **Summary**:
> We have here a case of Claimant, Ms. Carrie A. Spencer, age 28 years old, single mother of a 3-year-old son and formerly employed as a telemarketer for two and a half years until she was "taken off work by my doctor in 2003." Since then, our Claimant has not returned to any kind of gainful employment… "we live with my parents for meals and shelter, and food stamps, I use to have a medical card, but they took it away from me." She is not receiving any child support from her son's father, "my parents adopted my son and my son has Social Security."
>
> She is a high school graduate and she knows how to read and write well enough, but otherwise, did not have any other transferable skills to make a decent livelihood.
>
> Her normal daily activities consist of "I get up in the mornings and help with the housework, play with my son when I can, sometimes I go to my friends house and that's it." The Claimant is not sure if she can handle a full-time job

>if she were to go back to work, "I have to do the best I can to raise my son and move out of my parents house, if I can."
>
>Diagnostic studies were not made available for review.

(Tr. at 426-27.)

On December 19, 2006, a State agency medical source completed a Physical Residual Functional Capacity ["PRFC"] Assessment and opined that Claimant could perform light work with postural limitations marked as "occasionally" in all areas, save stooping, which was marked "frequently"; no manipulative, visual or communicative limitations; and unlimited in all environmental areas, save to avoid concentrated exposure to extreme temperatures and to avoid even moderate exposure to vibration. (Tr. at 430-34.) The evaluator, Marcel Lambrechts, M.D., concluded:

>This claimant's symptoms seem mostly credible. She has a diagnosis of fibromyalgia and her symptoms seem supportive. She c/o [complains of] pain all over her body and gets tired easily. She is able to perform a good number of light activities at home. She has a H/O [history of] right knee injury and wears a brace to walk. She does not limp however and can walk fine. Her RFC [residual functional capacity] is reduced accordingly.

(Tr. at 435.)

On July 11, 2007, a State agency source provided an internal medicine examination of Claimant. (Tr. at 510-13.) He concluded:

>IMPRESSION:
>1. Arthralgia.
>2. Chronic Lumbar Strain. There is no evidence of radiculopathy.
>
>SUMMARY: The claimant reports problems of joint pain. As noted above, there is joint pain, tenderness and decreased ROM. There is no synovial thickening, periarticular swelling, nodules or contractures consistent with rheumatoid arthritis.
>
>The claimant reports problems with her back. There are range of motion abnormalities of the lumbar spine as noted above. Straight leg raise test is

negative. There are no sensory abnormalities. Reflexes are normal. Muscle strength testing is normal. These findings are not consistent with nerve root compression.

(Tr. at 513.)

On July 21, 2007, a State agency medical source completed a Physical Residual Functional Capacity ["PRFC"] Assessment and opined that Claimant could perform medium work with postural limitations marked as "frequently" in all areas, save climbing, which was marked "occasionally"; no manipulative, visual, communicative or environmental limitations. (Tr. at 514-18.) The evaluator, James Binder, M.D., concluded:

> Clmt [claimant] not fully credible: Severity of symptoms are not fully supported by physical exam, which shows nl [normal] ROM [range of motion] of joints. Dx [diagnosis]: Arthralgia - no arthritis diagnosed / Lumbar Strain. RFC [residual functional capacity] set as medium based on hx [history] and pe [physical examination].

(Tr. at 521.)

On December 12, 2007, Robert Perez, M.D. completed a form titled "West Virginia Department of Health and Human Resources Medical Review Team (MRT) General Physical (Adults)." (Tr. at 522-25.) Although the handwritten responses are largely illegible, he has clearly marked "No" on the form in response to the questions: "Is applicant able to work full-time at customary occupation or like work? Is applicant able to perform other full time work?" (Tr. at 524.) In the "Summary of Conclusions" section of the form, Dr. Perez stated: "Patient has fibromyalgia & constant pain affecting her capacity to work." (Tr. at 525.) The report was provided by Claimant's representative. (Tr. at 522.)

Psychiatric Evidence

On December 31, 2005, a State agency source completed a Psychiatric Review Technique form ["PRTF"]. (Tr. at 331-44.) The evaluator, Jeff L. Harlow, Ph.D., licensed

psychologist, found Claimant's that an RFC Assessment was necessary to assess Claimant's "Anxiety-Related Disorders" impairment for the time period of August 19, 2005 to December 31, 2005. (Tr. at 331.) Dr. Harlow found that Claimant had no difficulties in maintaining social functioning, mild restriction of activities of daily living, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. at 341.) He found that the evidence does not establish the presence of the "C" criterion. (Tr. at 342.) Dr. Harlow concluded:

> ANALYSIS: Claimant statements about functional capacities on the ADL form are fully credible as they are internally consistent and externally consistent with statements made at the consultative evaluation.
>
> Although this claimant's mental impairment causes some limitations in specific capacities as denoted on the MRFC [Mental Residual Functional Capacity Assessment]; it is concluded that the claimant can perform repetitive work-related activities because these limitations are moderately limited or less.

(Tr. at 343.)

On December 31, 2005, Dr. Harlow completed a Mental Residual Functional Capacity Assessment of Claimant. (Tr. at 345-47.) He concluded that Claimant was not significantly limited in any of the twelve areas of understanding and memory, social interaction, or adaptation. (Tr. at 345-46.) In the eight areas of sustained concentration and persistence, she was not significantly limited in six areas and moderately limited only in two areas: the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them. Id. He concluded: "While the claimant's mental disorder causes some limitations as denoted in section II, the evidence in file indicates that claimant can perform repetitive one and two step work-like activities on a sustained basis. Please see PRTF for rationale."

(Tr. at 347.)

On March 11, 2006, Debra Lilly, Ph.D., licensed psychologist, reviewed the evidence of record and Dr. Harlow's reports and provided a "Case Analysis": "I have reviewed all the evidence in file, and the PRTF and MRFC of 12/31/05 are affirmed as written." (Tr. at 349.)

On January 4, 2007, a State agency medical source completed a Mental Status Examination report. (Tr. at 438-41.) The evaluator, Elizabeth A. Durham, M.A., licensed psychologist, reviewed treatment notes from Mountain Medical Care Center, did a clinical interview of Claimant and stated that Claimant "reported she has never received any type of mental health treatment. (Tr. at 438-39.) She concluded:

> MENTAL STATUS EXAMINATION: Appearance: Ms. Spencer is approximately 5 feet 6 inches and weighs 120 pounds. She has brown hair and brown eyes. She was dressed in casual clothing. Hygiene and grooming were adequate. There were no tattoos, scars or identifying marks. Attitude/Behavior: She exhibited a good attitude and was cooperative. Social: She interacted appropriately with the psychologist during the evaluation. Eye contact was normal. Length and depth of verbal responses were adequate. There was spontaneous generation of conversation. Speech: Relevant and coherent. It was delivered in a normal tone and normal pace. Orientation: She was fully oriented. Mood: Dysphoric. Affect: Restricted. Thought Process: There were no loose associations, incoherence, poverty of speech content, perseveration, thought blocking, echolalia or clanging. There was no circumstantiality, flight of ideas, tangentiality, word salad or neologisms. Thought Content: No evidence of delusions, preoccupations, obsessions or phobias. Perceptual: No evidence of illusions, depersonalizations, deja vu or hallucinations. Insight: Fair. Judgment: Within normal limits, based on her response to the letter question, "mail it." Suicidal Ideation/Homicidal Ideation: No ideation was reported. Immediate Memory: Within normal limits as evidenced by her ability to recall four of four words immediately. Recent Memory: Within normal limits as evidenced by her ability to recall four of four words in 30 minutes. Remote Memory: Within normal limits. Concentration: Within normal limits as evidenced by her Digit Span subtest score. Psychomotor Behavior: Within normal limits based on clinical observations.
>
> DIAGNOSES:
> Axis I  311          Depressive disorder NOS [not otherwise specified].

>    Axis II        V71.09        No diagnosis.
>    Axis III                     Fibromyalgia (as reported by Ms. Spencer).
>
>    DIAGNOSTIC RATIONALE: The diagnosis of depressive disorder NOS is based on Ms. Spencer's report of depressed mood, diminished interest in activities and feelings of worthlessness.
>
>    PROGNOSIS: Fair.
>
>    DAILY ACTIVITIES: When asked to describe a typical day, Ms. Spencer reported, "Try to get up out of bed and help raise my son."
>
>    SOCIAL FUNCTIONING: During the Evaluation: Based on mental status examination and clinical observation, Ms. Spencer interacted appropriately. Social functioning is within normal limits. Reported Social Activities: Ms. Spencer reports she talks with friends and family weekly.
>
>    PERSISTENCE: Ability to stay on task was within normal limits based on clinical observations.
>
>    PACE: Within normal limits based on clinical observations.
>
>    CAPABILITY: If granted benefits, Ms. Spencer is capable of managing finances.

(Tr. at 440-41.)

On January 11, 2007, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 443-56.) The evaluator, Tasneem Doctor, Ed. S. Ed. D., found Claimant's impairment was not severe regarding her depressive disorder NOS. (Tr. at 443, 446.) He found Claimant had mild limitation regarding restriction of activities of daily living, difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 453.) He stated that the evidence does not establish the presence of "C" criteria. (Tr. at 454.) Dr. Doctor concluded:

>    Ct. [claimant] appears partially credible as allegations are not fully supported by MER [medical evidence of record]. Ct. alleges problems w/ [with] her "nerves". She also reports difficulty with memory, concentration, understanding, and following instructions. She is not currently receiving

formal mental health tx [treatment], but PCP [primary care provider] prescribes meds [medications]. She reports that she has never received mental health tx. AFR form indicates limits primarily due to physical problems. She is able to cook simple meals, complete light cleaning, drive, and shop in stores about once a month. Social functioning was WNLS [within normal limits] at the CE [clinical evaluation]. Socially, she reports that a friend visits about five days a week. C/P/P [concentration/persistence/pace] and memory X [times] 3 were WNLS. There is no evidence of significant limitations due to a mental disorder.

(Tr. at 455.)

On June 14, 2007, a State agency medical source completed an Adult Mental Profile report. (Tr. at 490-95.) The evaluator, Lester Sargent, M.A., licensed psychologist, reviewed the evaluation report of Ms. Durham and evaluated Claimant. (Tr. at 491.) He reported that Claimant states that she lives alone in Boone County. (Tr. at 490.) Mr. Sargent concluded:

> MENTAL STATUS EXAMINATION: The following observations were made during the evaluation. Appearance: The claimant was casually dressed and with proper hygiene. She was well groomed and appeared her stated age of 29 years. Attitude/Behavior: The claimant was cooperative throughout the evaluation. Eye contact was fair. Speech: Speech was coherent and connected. Orientation: The claimant was oriented to time, place, person, and date. Mood: Observed mood was remarkable for mild depression and mild anxiety. Affect: Affect was mildly restricted. Thought Processes: Thought processes were understandable and connected. Thought Content: There was no evidence of delusions, paranoia, obsessive thoughts, or compulsive behaviors. Perceptual: There was no evidence of unusual perceptual experience. Judgment: Judgment was within normal limits, based on her responses to Comprehension questions. Insight: Insight was good, based on her response to questions regarding social awareness. Psychomotor Activity: There was no evidence of psychomotor agitation or retardation. Suicidal/Homicidal Ideation: The claimant denied suicidal and homicidal ideation. Immediate Memory: Immediate memory was within normal limits, based on her ability to instantly recall four of four words. Recent Memory: Recent memory was mildly deficient, as she was able to recall three of four words after a 20-minute delay. Remote Memory: Remote memory was within normal limits, based on her ability to recall details of her personal history. Concentration: Concentration was within normal limits, based on Digit Span subtest scaled score of 10. Persistence: Persistence was within

normal limits, based on her ability to remain on task. Pace: The pace was normal, as evidenced during the evaluation.

SOCIAL FUNCTIONING: During the Evaluation: Social functioning during the evaluation was within normal limits, based on clinical observations of social interaction with the examiner and others (i.e. eye contact, sense of humor, and mannerisms).

DIAGNOSES: Based on review of available records and impressions made during the evaluation, the following diagnoses are appropriate.

| | | |
|---|---|---|
| Axis I | 307.89 | Pain disorder associated with both psychological factors and a general medical condition |
| | 300.00 | Anxiety disorder, NOS |
| Axis II | V71.09 | No diagnosis |
| Axis III | | Fibromyalgia, chronic fatigue syndrome, and arthritis (per claimant)... |

SOCIAL FUNCTIONING: Self-Reported: The claimant occasionally goes to the stores and runs errands. She rarely dines out. She noted that friends often stop by and visit with her. She seldom talks on the telephone. She occasionally goes to Wal-Mart. She exercises by walking and doing stretching exercises. Her hobby is her 3-year-old boy. She keeps medical appointments. She does not attend church or other social functions. She reported one close friend. She does not maintain a checking account. She receives food stamps, in addition to financial assistance from her parents.

DAILY ACTIVITIES: The claimant arises around 10 a.m. She is able to perform all basic self-care duties without assistance. She performs household chores including cooking, laundry, and dishes. She is able to work up to 30 minutes at a time before having to take a break due to pain. Her daily routine begins by taking a bath, getting dressed, and eating cereal for breakfast. She spends time with her son during the day. She takes an afternoon nap, watches television, and spends most of the day at her parents' residence. She eats dinner at various times at her parents' house. She comes home around 10 p.m., takes a bath, watches television, and goes to bed around 12 a.m.

PROGNOSIS: Fair.

CAPABILITY: The claimant appears capable of managing her funds, should an award be made.

(Tr. at 492-94.)

On July 2, 2007, a State agency medical source completed a Psychiatric Review

Technique form. (Tr. at 496-509.) The evaluator, Rosemary L. Smith, Psy. D., found Claimant's impairment due to "anxiety disorder" and "pain disorder" was not severe for the time period "12/13/2002 to present." (Tr. at 496, 501-02.) She found Claimant had mild limitation regarding restriction of activities of daily living, difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 506.) She stated that the evidence does not establish the presence of "C" criteria. (Tr. at 507.) Dr. Smith concluded:

> Clmt [claimant] alleges problems in all mental areas.
>
> Claimant is not credible re: her allegations of limitations. Her ADL's appear limited due to physical problems. She has been cooperative across settings. The MSE's do not support significant limitations.
>
> There is no evidence of significant limitations due to a mental impairment.

(Tr. at 508.)

Analysis

It is recommended that the presiding District Judge find that the ALJ's decision dated September 2, 2008, is supported by substantial evidence. In his decision, the ALJ determined that Claimant suffered from fibromyalgia, lumbar strain, and arthralgia that limited Claimant to medium work. (Tr. at 12-31.) The ALJ concluded that Claimant did not suffer a severe mental impairment. (Tr. at 17-22.) The ALJ's decision is in keeping with the regulations related to the evaluation of mental impairments and is supported by substantial evidence. 20 C.F.R. §§ 404.1520a, §416.1520a (2010). Notably, while Claimant alleges depression and anxiety, the State agency medical sources opined that Claimant's psychiatric impairment was not severe and that Claimant had never received mental health treatment. (Tr. at 347, 443, 455, 496, 508.)

The ALJ's findings about Claimant's physical impairments and their resulting limitations also are supported by substantial evidence. As the summarized evidence of record indicates, Claimant has only had conservative treatment and her physical conditions were not disabling. The substantial evidence of record supports a finding that Claimant did not meet the requirements for disability, and, instead, could return to her previous work as a telemarketer. (Tr. at 30-31.) As pointed out by the Commissioner, the ALJ's determination that Claimant "can return to her past relevant work is consistent with the opinions of Drs. Go (Tr. 350-57), Wirts (Tr. 358), Lambrechts (Tr. 430-37), Binder (Tr. 514-21), and Chillag (Tr. 70)." (Def.'s Br. at 13-14.) Further, Drs. Hoover and Perez are the only physicians who opined that Plaintiff could not work and the ALJ fully discussed his reasons for discounting their opinions. (Tr. at 29-30.)

The court further finds that the ALJ's pain and credibility findings are consistent with the applicable regulation, case law and social security ruling ("SSR") and are supported by substantial evidence. 20 C.F.R. §§ 404.1529(b), 416.1529(b) (2007; SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). The ALJ's 26-page decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain, precipitating and aggravating factors and Claimant's medication, and he ultimately determined that Claimant was not fully credible. (Tr. at 7-32.)

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby

**FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F. 2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendations and to transmit a copy of the same to counsel of record.

<u>December 6, 2011</u>
        Date

                                            *Mary E. Stanley*
                                            Mary E. Stanley
                                            United States Magistrate Judge